# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CMD GLOBAL PARTNERS (USA), LLC, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. N25C-10-326 FWW |
| WESTERN ALLIANCE BANK, MTSELLER, INC. f/k/a MANTLE, INC., THEODORE SOROM, STEPHEN CONNOR, ALEXANDRA MANICK, SHYMAN KAMADOLLI; and DOES 1-10, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

Submitted: April 9, 2026
Decided: June 5, 2026

*Upon Defendant Western Alliance Bank's Rule 12(b)(6) Motion to Dismiss Counts III, IV, V and VI of Plaintiff's Amended Complaint*
**DENIED in part and GRANTED in part.**

*Upon the Motion of Defendants Theodore Sorom and Stephen Connor to Dismiss Counts V, VI, and VII of the Amended Complaint Pursuant to Superior Court Rule 12(b)(6)*
**DENIED in part and GRANTED in part.**

*Upon Defendants Alexandra Manick and Shyam Kamadolli's Motion to Dismiss Counts V, VI, and VII of the Amended Complaint*
**GRANTED.**

## ORDER

Maria Aprile Sawczuk, Esquire, Aaron R. Harburg, Esquire, Ainsley G. Moloney, Esquire (*pro hac vice*) GOLDSTEIN & MCCLINTOCK, LLLP, 501 Silverside Road, Suite 65, Wilmington, DE 19809, attorneys for Plaintiff CMD Global Partners (USA), LLC.

Ronald N. Brown, III, Esquire, Caleb G. Johnson, Esquire, Isabelle Ord, Esquire (*pro hac vice),* Sam Bodle, Esquire (*pro hac vice*) DLA PIPER LLP (US), 1201 North Market Street, Suite 2100, Wilmington, DE 19801, attorneys for Defendant Western Alliance Bank.

R. Karl Hill, Esquire, William A. Hazeltine, Esquire, SULLIVAN NIMEROFF BROWN HILL LLC, 919 North Market Street, Suite 420, Wilmington, DE, attorneys for Defendants Theodore Sorom and Stephen Connor.

Catherine G. Dearlove, Esquire, Nicole M. Henry, Esquire, Daniel M. Boucot, Esquire, RICHARDS, LAYTON, & FINGER, P.A., 920 North King Street, Wilmington, DE 19801, Attorney for Defendants Alexandra Manick and Shyam Kamadolli.

**WHARTON, J.**

This 5th day of June 2026 upon consideration of: (1) Defendant Western Alliance Bank's ("Western Alliance") Rule 12(b)(6) Motion to Dismiss Counts III, IV, V and VI of Plaintiff's Amended Complaint,[1] CMD Global Partners (USA), LLC's ("CMD Global") Response,[2] Western Alliance's Reply;[3] (2) the Motion of Defendants Theodore Sorom and Stephen Connor ("Sorom and Connor") to Dismiss Counts V, VI, and VII of the Amended Complaint Pursuant to Superior Court Rule 12(b)(6),[4] CDM Global's Answer,[5] Sorom and Connor's Reply;[6] (3) the Motion of Defendant's Alexandra Manick and Shyman Kamadolli (Manick and Kamadolli") to Dismiss Counts V, VI, and VII of the Amended Complaint,[7] CDM Global's Answer,[8] Manick and Kamadolli's Reply,[9] and the record in this case, it appears to the Court that:

1. On October 23, 2025, CMD Global filed a Complaint against Western Alliance and Mantle, Inc.[10] The Complaint was amended on

---

[1] Def. Western Alliance's Mot. to Dismiss ("MTD"), D.I. 28.
[2] Pl.'s Resp. to Def. Western Alliance's MTD, D.I. 37.
[3] Def. Western Alliance's Reply, D.I. 41.
[4] Defs. Sorom and Connor's MTD, D.I. 39.
[5] Pl.'s Ans. to Sorom and Connor's MTD, D.I. 56.
[6] Defs. Sorom and Connor's Reply, D.I. 61.
[7] Defs. Manick and Kamadolli's MTD, D.I. 50.
[8] Pl.'s Ans. to Manick and Kamadolli's MTD, D.I. 59.
[9] Defs. Manick and Kamadolli's Reply, D.I. 62.
[10] Compl., D.I. 1.

November 5, 2025 to add the other defendants and allege additional claims.[11] CMD Global's Amended Complaint asserts claims against Western Alliance for Tortious Interference with Contractual Relations (Count III),[12] Tortious Interference with Business Relations (Count IV),[13] and Fraudulent Transfer under the Delaware Uniform Fraudulent Transfer Act ("DUFTA") (Counts V and VI).[14] CMD Global alleges that Western Alliance intentionally interfered with CMD Global's engagement and business relationships surrounding the sale of Mantle, Inc.'s assets and orchestrated transfers of proceeds, cash, and intellectual property-related value to prevent CMD Global from collecting its earned fee.[15] The Amended Complaint includes Defendants Sorom, Connor, who were officers of Mantle, and Manick and Kamadolli, who were outside directors, in Counts V and VI.[16] It also brings a count for Quantum Meruit in the alternative against "Defendants MTSELLERS, Inc. f/k/a Mantle, Inc. and its directors and officers" (Count VII).[17]

---

[11] Am. Compl., D.I. 34.
[12] *Id.* at ¶¶ 123-29.
[13] *Id.* at ¶¶ 130-37.
[14] *Id.* at ¶¶ 138-51.
[15] *Id.* at ¶¶ 123-137.
[16] *Id.* at ¶¶ 138-51.
[17] *Id.* at ¶¶ 152-58.

2.      Western Alliance Bank extended a loan to Mantle in July 2024 (the "Loan").[18]  In connection with the Loan, Western Alliance obtained a first-priority security interest in Mantle's assets other than Mantle's intellectual property.[19]

3.      CMD Global and Mantle entered into an Engagement Letter under which CMD Global would solicit offers and assist Mantle with strategic alternatives.[20]  The Engagement Letter included a Mergers and Acquisitions ("M&A") transaction success fee in an amount of not less than $1,250,000 for transactions valued at $25 million or less.[21]  CMD Global would earn this fee if a transaction closed during the engagement or a 12-month tail period.[22] CMD Global alleges it fully performed its obligations, secured multiple offers, and obtained a non-binding Indication of Interest from the Angstrom Group — the best and highest bid ready and able to close.[23]

4.      CMD Global alleges that Western Alliance, Mantle's senior lender, took control of Mantle's cash and operations under a July 18, 2024

---

[18] *Id*. at ¶ 35.
[19] *Id.* at ¶ 36.
[20] *Id*. at ¶¶ 19, 25.
[21] *Id*. at ¶ 29.
[22] *Id*. at ¶ 30.
[23] Pl.'s Resp. to Def. Western Alliance's MTD, at 4, D.I 37.

Loan and Security Agreement after learning of the Angstrom offer.[24] Western Alliance issued a default notice, and directed Mantle to grant Western Alliance a security interest in previously excluded intellectual property ("IP Assets") in exchange for allowing Mantle to retain sufficient operating cash and to effectuate an M&A transaction.[25]

5. CMD Global further alleges that on September 11, 2025, it learned Western Alliance asked Sorom: "How can we circumvent CMD's fees?"[26] Sorom then told CMD Global on September 24, 2025, that Western Alliance had "veto power" and would require CMD Global to reduce its fee or Western Alliance would pursue an Article 9 sale.[27]

6. On September 25, 2025, shortly after CMD Global secured a revised Angstrom offer, Western Alliance directed Mantle to terminate the Engagement Letter while acknowledging post-termination obligations.[28] CMD Global pleads that Western Alliance's actions cut CMD Global off from the process and communications with the Angstrom Sale.[29] Mantle then consummated a transaction with Angstrom around October 3, 2025, on terms

_____

[24] Am. Compl. at ¶¶ 35, 39, 40, D.I. 34.
[25] *Id.* at ¶¶ 47-48.
[26] *Id.* at ¶ 52.
[27] *Id.* at ¶¶ 74-76.
[28] *Id.* at ¶¶78-79.
[29] *Id.* at ¶ 90.

near CMD Global's revised offer, selling substantially all of Mantle's assets for approximately $3 million on a debt and cash free basis.[30]

7. According to the Amended Complaint, upon receipt of the approximately $3 million in transaction proceeds and $2.4 million in cash assets following the closing of the transaction, Western Alliance was repaid more than the full amount or nearly the full amount of all outstanding obligations under the Loan and Security Agreement.[31] Western Alliance directed Mantle to transfer, and Mantle transferred its IP Assets to Western Alliance so that such assets would be out of the reach of CMD Global with the actual intent to hinder, delay, or defraud it, according to CMD Global.[32]

8. CMD Global alleges that at or around the same time, Western Alliance or Mantle's officers and directors, separately or in combination caused or directed the transfer of all of Mantle's remaining cash and the transaction proceeds to Western Alliance, rendering Mantle functionally insolvent even though it was aware of CMD Global's September 26, 2025 demand and threatened litigation.[33]

---

[30] *Id.* at ¶ 90.
[31] *Id.* at ¶ 96.
[32] *Id.* at 97-98.
[33] *Id.* at ¶¶ 91-96.

9.     CMD Global initiated suit,[34] later amending the Complaint to add DUFTA claims and individual defendants, Sorom, Connor, Manick, and Kamadolli.[35]   Now, all defendants, save MTSELLER, f/k/a Mantle, Inc., move to dismiss.

10.     Western Alliance moves to dismiss, principally contending that: (a) the Court may consider certain documents outside the complaint as "integral"; (b) its conduct was justified as a senior secured lender enforcing a valid, legally protected interest; (c) there was no actionable "transfer" under DUFTA because Western Alliance's lien was "valid" and exceeded the transferred asset value; (d) CMD Global has not adequately pled actual fraudulent intent or particularity.   CMD Global's answering brief opposes dismissal and argues that the extrinsic documents proffered by Western Alliance (an IP Security Agreement and Settlement Agreement) should not be considered on Rule 12(b)(6).[36]

11.     Sorom and Connor move to dismiss Counts V, VI, and VII. They contend Count V should be dismissed for failure to state a claim because it fails to allege that the repayment to Western Alliance was a transfer of an

---

[34] *See generally* Compl., D.I. 1.
[35] *See generally* Am. Compl., D.I. 34.
[36] Pl.'s Resp. to Def. Western Alliance's MTD at 12, 15, D.I. 37.

"asset" as defined by DUFTA.[37] Since the property transferred was entirely subject to a valid lien, it cannot be the subject of a fraudulent transfer.[38] Count VI, which seeks to recover the allegedly fraudulent transfers pursuant to DUFTA, should be dismissed against them because as officers of Mantle, they did not receive any of the transfers.[39] Lastly, Count VII – the *quantum meruit* claim - should be dismissed because Sorom and Connor, as officers of Mantle, did not receive the benefit of any services provided to Mantle.[40] CMD Global opposes the motion. It argues that the Amended Complaint alleges sufficient facts to support a fraudulent transfer claim in Count V,[41] Count VI properly pleads a claim for relief against Sorom and Connor as officers,[42] and the alternative claim for quantum meruit in Count VII is properly asserted.[43]

12.    Lastly, directors Manick and Kamadolli move to dismiss Counts V, VI, and VII. First, they argue the claims should be dismissed against them for lack of personal jurisdiction and failure to properly effect service under 10 *Del. C*. § 3114 as directors of a Delaware corporation.[44] Next, the fraudulent

---

[37] Sorom and Connor's MTD, at 9-10, D.I. 39.
[38] *Id.*
[39] *Id.* at 11-13.
[40] *Id.* at 13-15.
[41] Pl.'s Ans. to Defs. Sorom and Connor's MTD, at 13-17, D.I. 56.
[42] *Id.* at 17-20.
[43] *Id.* at 20-23.
[44] Defs. Manick and Kamadolli's MTD, at 12-24  D.I. 50.

transfer claims in Counts V and VI must be dismissed against them under Rule 12(b)(6) because they are not proper parties under DUFTA, and, as argued by Sorom and Connor, because the transferred assets were subject to a valid lien, their transfer could not have been fraudulent under DUFTA.[45]  Finally, the *quantum meruit* claim in Count VII should be dismissed because the Amended Complaint alleges a valid contract, precluding a *quantum meruit* recovery.[46] Additionally, as directors, Manick and Kamadolli CMD Global contracted with Mantle and not them.[47]  CMD Global maintains that Delaware has jurisdiction over the director defendants and that they were properly served,[48] it stated viable claims against them as directors,[49] and the *quantum meruit* claim is properly pled in the alternative.[50]

13.    **Western Alliance's Motion to Dismiss.**   Western Alliance moves to dismiss Counts III, IV, and V, all under Rule 12(b)(6).  A motion to dismiss for failure to state a claim pursuant to Superior Court Rule 12(b)(6) will not be granted if the "plaintiff may recover under any reasonably

---

[45] *Id.* at 27-28.
[46] *Id.*
[47] *Id.*
[48] Pl.'s Ans. to Defs. Manick and Kamadolli's MTD, at 14-22, D.I. 59.
[49] *Id.* at 24-25.
[50] *Id.* at 32-35.

conceivable set of circumstances susceptible of proof under the complaint."[51] The Court's review is limited to the well-pled allegations in the Complaint.[52] In ruling on a 12(b)(6) motion, the Court "must draw all reasonable factual inferences in favor of the party opposing the motion."[53] Dismissal is warranted "only if it appears with reasonable certainty that the plaintiff could not prove any set of facts that would entitle him to relief."[54]

14. Western Alliance asks the Court to consider the IP Security Agreement and Settlement Agreement as integral to the complaint or incorporated by reference.[55] CMD Global objects, asserting that it lacked access to it when filing, that the Security Agreement attached to the Complaint expressly excluded IP collateral, and that the later IP and Settlement agreements were not contemplated by and materially differ from the Security Agreement's terms.[56]

15. The Court agrees with CMD Global that, at the pleading stage, the complaint generally defines the universe of facts for a Rule 12(b)(6)

---

[51] *Browne v. Robb*, 583 A.2d 949, 950 (Del. 1990).
[52] *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005).
[53] *Id.*
[54] *Id.*
[55] Def. Western Alliance's MTD at 11-12, D.I. 28.
[56] Pl.'s Resp. to Def.'s MTD at 12-13, D.I.37.

11

ruling.[57]  A document will only be considered if one of the well-recognized limited exceptions apply: (1) when the document is integral to a plaintiff's claim and incorporated into the complaint; (2) when the document is not being relied upon to prove the truth of its contents; or (3) when the document is an adjudicative fact subject to judicial notice.[58]  A document is deemed integral and incorporated into the complaint if the complaint relies on it as the source of its factual assertions.[59]

16.    The Court declines to consider the IP Security Agreement and the Settlement Agreement for purposes of a motion to dismiss.  Western Alliance's financing statements may be judicially noticed as public filings as they were filed with the Delaware Secretary of State and their introduction was not challenged by CMD Global.

17.    Both the IP Security Agreement and the Settlement Agreement do not fall into any of the previously mentioned exceptions.  Western Alliance's attempt to characterize these documents as incorporated by reference to the Security Agreement which was attached as an exhibit to the

---

[57] *Murray v. Mason*, 244 A.3d 187, 192 (Del. Super. Ct. 2020) (quoting *In re GM (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006)).
[58] *In re Gardner Denver, Inc*., 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014).
[59] *See Fortis Advisors LLC v. Allergan W.C. Holding Inc*., 2019 WL 5588876, at *3 (Del. Ch. Oct. 30, 2019).

Complaint fails.[60]  The Settlement Agreement and IP Security Agreement are separate agreements from the Security Agreement, and there is no clear intent for them to be incorporated by reference.  Specifically, the Court agrees with CMD Global that Western Alliance's expansive definition of "Loan Documents"[61] would effectively nullify the rule by allowing a flood of unrelated materials to be considered at the motion to dismiss stage.  Therefore, the Settlement Agreement and IP Security Agreement will not be considered by the Court in deciding this motion.

18.    CMD Global adequately pleads tortious interference by alleging that Western Alliance knowingly induced Mantle to terminate the Engagement Letter without justification, excluding CMD Global from the sale process, and causing the loss of contractual fees and related damages.  To state a claim for tortious interference with contractual relations, CMD Global must plead: (1) a valid contract; (2) knowledge by Western Alliance; (3) intentional acts that are a significant factor in a breach; (4) without justification; and (5) damages.[62]

---

[60] Def. Western Alliance's MTD at 12, D.I. 28.
[61] Pl.'s Resp. to Def. Western Alliance's MTD, D.I. 37.
[62] *Bhole, Inc. v. Shore Invs., Inc*., 67 A.3d 444, 453 (Del. 2013) (citing *Irwin & Leighton, Inc. v. W.M. Anderson Co.,* 532 A.2d 983, 992 (Del.Ch.1987)).

19.     At this stage, CMD Global's allegations suffice. Regarding a valid contract and knowledge, CMD Global alleges a valid Engagement Letter with Mantle,[63] that Western Alliance was aware of it,[64] that Western Alliance expressed a desire to circumvent CMD Global's fee,[65] and asserted "veto power" over the transaction process.[66] As to the intentional interference and causation element, CMD Global pleads Western Alliance directed Mantle to terminate the Engagement Letter within hours of CMD Global securing a revised Angstrom offer,[67] cut CMD Global off from the sale process,[68] and thereby caused Mantle not to perform payment obligations owed upon closing during the tail period.[69] For damages, CMD Global alleges loss of its success fee and diminution of consideration caused by delay and interference.[70]

20.     The main element in dispute is whether Western Alliance acted without justification. Justification is typically a fact-intensive inquiry to be made after considering the circumstances of the case.[71] CMD Global alleges

---

[63] Am. Compl. at ¶¶ 19,79, D.I. 34.
[64] *Id.* at ¶¶ 43-44, 50, 52, 55, 60.
[65] *Id.* at ¶¶ 73-77, 78, 80-84, Ex. D.
[66] *Id.* at ¶¶ 74-75.
[67] *Id.* at ¶ 78.
[68] *Id*. at ¶¶ 83-86.
[69] *Id*. at ¶¶ 97-99.
[70] *Id.*
[71] *Bowl-Mor Co. v. Brunswick Corp.*, 297 A.2d 61, 66 (Del. Ch. 1972).

14

conduct by Western Alliance beyond mere exercise of contractual remedies such as: (1) a scheme to avoid fees after CMD Global procured a buyer; (2) exertion of control, including "veto power;" (3) demands to encumber previously excluded IP; (4) a directive to terminate CMD Global's engagement to eliminate transparency; and (5) directions regarding sweeping proceeds and cash.[72] Taken as true, these facts plausibly allege that Western Alliance acted "without justification" for the purposes of the pleading stage. CMD Global squarely alleges Western Alliance's aim to "circumvent CMD Global's fees," its use of leverage to secure new IP collateral, and direction to terminate CMD Global's post-procurement of the buyer.[73]

21. Western Alliance argues that the Restatement (Second) of Torts §773 justifies its conduct as enforcement of a legally protected interest in good faith and by appropriate means.[74] CMD Global's allegations, however, plausibly support inferences of bad faith and inappropriate means (*e.g.*, the timing and purpose of the termination, cutting CMD Global out despite tail protection,[75] and steps to preclude payment), which cannot be resolved on the

---

[72] *See generally,* Am. Compl., D.I. 34.
[73] *Id.*
[74] Def. Western Alliance's MTD at 18, D.I. 28.
[75] CMD Global defines "tail period" in its complaint as: "(i) within the term of CMD's engagement, or (ii) within the 12 months after termination of its engagement" Am. Compl. at ¶ 30, D.I. 34.

pleadings.[76] CMD Global highlights communications evidencing Western Alliance's intent, timing of the termination relative to CMD Global's revised offer, and alleged diminution from delay.[77] Accordingly, Western Alliance's Motion to Dismiss Count III is **DENIED.**

22. Turning next to Count IV, Tortious Interference with Business Relations, CMD Global must plead: (a) reasonable probability of a business opportunity; (b) intentional interference by defendant with that opportunity; (c) proximate causation; and (d) damages.[78]

23. CMD Global alleges a probability of it continuing to facilitate and close the Angstrom transaction, and to maintain working relationships with Mantle and potential purchasers.[79] Western Alliance's intentional acts included directing termination of CMD Global's engagement and excluding them from the process.[80] CMD Global alleges that they suffered damages, specifically by the non-payment of the M&A Transaction Success fee.[81]

---

[76] *Flores v. Strauss Water, Ltd.,* 2016 Del. Ch. LEXIS 145, at \*41 (Ch. Sep. 22, 2016).
[77] Am. Compl. at ¶¶ 40, 44, 50-52, D.I. 34.
[78] *Connolly v. Labowitz*, 519 A.2d 138, 143 (Del. Super. Ct. 1986) (quoting *DeBonaventura v. Nationwide Mut. Ins. Co.*, Del. Ch., 419 A.2d 942, 947 (1980)).
[79] Am. Compl. at ¶¶ 19, 26-28, 34, D.I. 34.
[80] *Id.* at ¶¶ at 43-44, 74-78.
[81] *Id.* at ¶¶ at 99-100, 102.

24.     CMD Global pleads it had secured offers,[82] continued to negotiate improved pricing with Angstrom,[83] received assurances of payment,[84] and maintained relationships necessary to consummate the sale, all of which were disrupted by Western Alliance's direction to terminate CMD Global and exclude it from the sale process.[85]  As with Count III, Western Alliance's justification defenses turn on factual considerations inappropriate for resolution now.  CMD Global alleges intentional conduct by Western Alliance aimed at eliminating CMD Global's participation and fee.[86]  Those allegations make the claim reasonably conceivable and include sufficient facts to support a basis for relief.  Moreover, CMD Global convincingly distinguishes authority cited by Western Alliance, *Surf's Up Legacy Partner, LLC v. Virgin Fest LLC.*[87]  As CMD Global emphasizes, the relationship between themselves and Western Alliance is not one of competitors.  Thus, the concern of a "chilling effect" on competition is of no moment here.[88]  Western Alliance's Motion to Dismiss Count IV is **DENIED.**

---

[82] *Id.* at ¶¶ 71-72.
[83] *Id.*
[84] *Id.* at ¶¶ 62-63.
[85] *Id.* at ¶ 133.
[86] *Id.* at ¶¶131-33.
[87] 2021 WL 117036, at *6 (Del. Super. Ct. Jan. 13, 2021).
[88] Def. Western Alliance's MTD at 14, D.I. 28.

25. In Count V, CMD Global asserts avoidance of fraudulent transfer under 6 *Del. C.* § 1304(a)(1). The Amended Complaint alleges that Mantle transferred transaction proceeds and cash to Western Alliance with actual intent to hinder, delay, or defraud CMD Global's fee, and that Mantle separately granted new security interests in IP assets to Western Alliance with similar intent.[89]

26. A qualifying transfer must be alleged by CMD Global to properly state a claim for actual fraudulent transfer.[90] A qualifying transfer is defined as:

> [E]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance but excludes, without limitation, any disposition of or parting with property or an interest in property described in paragraph (2) of this Section.[91]

An asset is defined as property of a debtor, but excludes "[p]roperty to the extent it is encumbered by a valid lien…."[92] Western Alliance cites *Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC*,[93] for the

---

[89] Am. Compl. at ¶¶ 138-45, D.I. 34.
[90] 6 *Del. C.* § 1301.
[91] 6 *Del. C.* § 1301(12).
[92] 6 *Del. C.* § 1301(2).
[93] 2023 WL 5688392, at *8 (Del. Ch. Sept. 5, 2023).

proposition that, "[f]or a transaction to qualify as a 'transfer' of 'assets' under the DUFTA, the value of the transferred property must exceed the value of any valid liens."[94] Western Alliance argues that no "transfer" occurred because the property was encumbered by a "valid lien" exceeding the value of the transferred assets.[95] CMD Global responds that whether and to what extent Western Alliance held a "valid lien" that fully absorbed the transferred value presents factual issues not resolved by the pleadings alone.[96]

27. At this stage, CMD Global's allegations suffice. CMD Global alleges Mantle transferred all transaction proceeds and remaining cash to Western Alliance while aware of CMD Global's threatened litigation, rendering Mantle functionally insolvent, and did so with actual intent to hinder, delay, or defraud.[97] CMD Global further alleges badges of fraud, including concealment, the timing relative to threatened suit and fee entitlement, transfer of substantially all assets, and lack of reasonably equivalent value for newly granted IP security.[98] Most importantly, CMD Global alleges that the transfer of the proceeds of the Angstrom sale to

---

[94] *Id.*
[95] Def. Western Alliance's MTD at 29, D.I. 28.
[96] Pl.'s Resp. to Western Alliance's MTD at 32, D.I. 37.
[97] Am. Compl. at ¶¶ 142-144, D.I. 34.
[98] Pl.'s Resp. to Western Alliance's MTD at 30-31, D.I. 37.

Western Alliance exceeded or nearly exceeded the full amount of Mantle's indebtedness to Western Alliance.[99] Because the Amended Complaint alleges that the value of property transferred to Western Alliance, when viewed in the light most favorable to CMD Global, exceeded the amount of any valid liens, there is at least a factual issue that the transaction would count as a transfer under DUFTA.

28. Western Alliance relies on a UCC-1 and the Settlement Agreement to show the lien's value exceeded transferred value.[100] The Court declines to consider the Settlement Agreement at this stage. In any event, CMD Global has not pled facts conceding lien scope, collateral value, or outstanding debt in a manner that would defeat the claims as a matter of law. CMD Global argues discovery is needed on loan documents, loan accounting, prior sweeps or foreclosures, allocation of value, and the validity/scope of any asserted liens against specific assets and proceeds. The Court agrees.

29. As to Rule 9(b), CMD Global pleads actual intent with particularity.[101] The complaint details chronology, communications evidencing purpose to avoid fees,[102] steps to secure previously excluded IP

---

[99] Am. Compl. at ¶ 96., D.I. 34.
[100] Def. Western Alliance's MTD at 31, D.I. 28.
[101] Super. Ct. Civ. R. 9.
[102] Am. Compl. at ¶¶ 52, 74-75, D.I. 34.

collateral during distress,[103] timing of Western Alliances assertion of control over Mantle,[104] termination, concealment of closing, and immediate sweeping of proceeds and cash.[105] Specifically the Court finds that CMD Global identified specific statements, dates, actions, and transfers tied to the alleged intent to hinder, delay, or defraud CMD Global.

30.     CMD Global alleges that the Security Agreement excluded IP collateral.[106] It further asserts that Western Alliance sought and obtained a new security interest in previously unencumbered IP while Mantle was insolvent.[107] CMD Global also contends that this new obligation was incurred to prevent it from accessing the value of the IP and its proceeds.[108] Western Alliance's contention that IP-related proceeds were already within collateral cannot defeat CMD Global's allegations at this stage, particularly given CMD Global's pleading that IP was previously excluded and that the new grant encumbered previously free assets. CMD Global pleads that the new IP Security Agreement was demanded post-default to avoid payment of CMD Global's fee and that no reasonably equivalent value flowed to Mantle for that

[103] *Id.* at ¶ 48.
[104] *Id.* at ¶¶ 40, 74-75, 80.
[105] *Id.* at ¶¶ 43; 52; 97-99.
[106] Pl.'s Resp. to Western Alliance's MTD at 36, D.I. 37.
[107] *Id.*
[108] *Id.*

encumbrance.[109]  On this record, Count V is reasonably conceivable.  Western Alliance's Motion to Dismiss Count V is **DENIED.**

31.    Turning to count VI, the Court agrees with Western Alliance that CMD Global asserts a remedy not recognized as a cause of action.  It is well-recognized that an attachment is a remedy available at law.[110]  Through Count VI, CMD Global seeks a specific remedy for the success of Count V.  While this remedy can be sought, as a technical matter, it cannot be asserted as a cause of action.[111]   Western Alliance's Motion to Dismiss Count VI is **GRANTED**.  This ruling has no effect on the case other than to clean up the pleadings.[112]

32.    **Sorom and Connor's Motion to Dismiss.**  Sorom and Connor move to dismiss Counts V, VI, and VII, also under Rule 12(b)(6).  In seeking dismissal of Count V, they argue, as Western Alliance did, that the transfer to Western Alliance was not a qualifying transfer under DUFTA because the transferred assets were fully encumbered by obligations to Western Alliance.[113]  The Court was unpersuaded when Western Alliance made that

---

[109] *Id.*

[110] *Yu v. GSM Nation, LLC*, 2017 WL 2889515, at *4 (Del. Ch. July 7, 2017).

[111] *Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155, 203 (Del. Ch. 2014).

[112] *Id.*

[113] Defs. Sorom and Connor's MDT, at 9-10, D.I. 39.

argument and remains unpersuaded by Sorom and Connor. Sorom and Connor's Motion to Dismiss Count V is **DENIED.**

33.	Sorom and Connor next argue that Count VI purports to seek recovery of the alleged fraudulent transfers and attach the transferred property in order to make it whole. [114] While Count VI names all Defendants, it only seeks relief from Mantle and Western Alliance:

> CMD seeks an order and judgment against all Defendants (1) issuing an attachment to the Transaction Proceeds, Cash Assets, and IP Assets held by Western Alliance or Mantle in the amount of the M&A Transaction Fee for the benefit of CMD [and] (2) allowing CMD to recover the M&A Transaction Success Fee from Mantle and Western Alliance pursuant to § 1307 of the DUFTA….. [115]

Further, nothing in DUFTA allows for the recovery of a judgment against Sorom and Connor as officers of Mantle because 6 *Del. C.* § 1308(b) limits recovery to transferees and Sorom and Connor were not transferees.[116]

36.	Citing *Humanigen, Inc. v. Savant Neglected Diseases, LLC,*[117] CMD Global counters that a "non-transferee can be liable for fraudulent

---

[114] *Id.* at 10-13.
[115] *Id.*
[116] *Id.* (citing 6 *Del. C.* §§ 1307(a), 1308(b)).
[117] 2012 WL , 4344172, at *16 (Del. Super. Ct. July 9, 2021).

23

transfer if it is a beneficiary of the fraudulent transfer."[118]  According to CDM Global the benefit Sorom and Connor received was "indirect" - it allowed them to "appease" Western Alliance.[119]  But, such a speculative and non-quantifiable indirect "benefit" does not pass muster.  The Court must determine: (1) whether the benefit was received by the beneficiary; (2) whether the benefit is quantifiable; and (3) whether the benefit is "accessible to the beneficiary."[120]  Under this test (with its requirement that all three factors be present), Sorom and Connor are not beneficiaries.

36.     Apparently sensing the thin reed it was grasping with its indirect beneficiary argument, CDM Global seeks further discovery to determine whether the Loan and Security Agreement's "Guaranty" provision provides Sorom and Connor with a real benefit.[121]  This back-up argument fails because there are no allegations in the Amended Complaint that either Sorom or Connor guaranteed Mantle's obligation to Western Alliance or that the payment to Western Alliance satisfied any guaranty obligations.

---

[118] Pl.'s Ans. to Sorom and Connor's MTD, at 17-18, D.I. 56.
[119] *Id.*
[120] *Id.* (citing *In re Green Field Energy Servs. Inc.*, 2018 WL 1116374, at *1 (Bank. D. Del. Feb. 27, 2018)).
[121] Pl.'s Ans. to Sorom and Connor's MTD, at 18-19, D.I. 56.

35. Lastly, CDM Global argues that "principles of equity" under § 1307 allows CDM Global to recover against Sorom and Connor.[122] Nowhere in § 1307 does it authorize the Court to expand the basis for finding liability for a fraudulent transfer. Rather, Delaware courts have construed the remedial provisions of the statute narrowly and have rejected attempts to create secondary liability.[123] Sorom and Connor's Motion to Dismiss Count VI is **GRANTED.**

36. Finally, Sorom and Connor move to dismiss Count VII, CDM Global's alternate Q*uantum Meruit* claim. The claim is pled in the alternative "in the event the Engagement Letter or its provisions are deemed unenforceable."[124] "'*Quantum meruit* 'is a quasi-contractual remedy by which a plaintiff, in the absence of an express agreement, can recover the reasonable value of the materials or services it rendered to the defendant.'"[125] Recovery on the basis of *quantum meruit* is generally available only if there is no express

---

[122] *Id.* at 19.

[123] *Cleveland-Cliffs Burns Harbor LLC v. Boomerang, LLC*, 2023 WL 5688392, at n. 144.

[124] Am. Compl. at ¶ 153, D.I. 34.

[125] *Alpha Contracting Services, Inc. v. 13 Professional Retail Services, Inc.* 2019 WL 151482, at *3 (Del. Super. Jan. 9, 2019) (quoting *Middle States Drywall, Inc. v. DMS Properties-First, Inc.*, 1996 WL 453418, at *10 (Del. Super. May 18, 1996) (quotations omitted).

contract between the parties.[126] Here, Sorom and Connor acknowledge that the Engagement Letter is "a valid, binding, and enforceable contract."[127] Since *quantum meruit* and an enforceable agreement cannot co-exist, and because the existence of a valid agreement is unchallenged, Sorom and Connor's Motion to Dismiss Count VII is **GRANTED.**

37.     **Manick and Kamadolli's Motion to Dismiss.** Manick and Kamadolli move to dismiss Counts V, VI, and VII. They move to dismiss all claims against them on the basis of lack of personal jurisdiction and ineffective service.[128] They move under Rule 12(b)6) to dismiss Counts V and VI, because, as directors of Mantle, they were neither transferees, nor transferors of Mantle's assets to Western Alliance.[129] They move to dismiss the *Quantum Meruit* claim because they too do not challenge the validity of the Engagement Letter.

38.     The Court notes that Manick and Kamadolli move to dismiss Count V on a different basis than Sorom and Connor. Sorom and Connor argued that the transaction did not qualify as a transfer under DUFTA because the amount of the transfer did not exceed Mantle's indebtedness to Western

---

[126] *See, Chrysler Corp. v. Airtemp Corp.,* 426 A.2d 845, 853 (1980).
[127] Pl.'s Sorom and Connor's MTD, at 14, D.I.39.
[128] Defs. Manick and Kamadolli's MTD, at 12-24, D.I. 50.
[129] *Id.* at 24-29.

Alliance.[130]  As discussed above, the Amended Complaint alleged that the amount of the transfer did exceed the indebtedness and denied Sorom and Connor's Motion to Dismiss Count V.[131]  In contrast, Manick and Kamadolli take a more persuasive approach.  They focus on their status as directors who were not transferees under DUFTA.[132]  DUFTA provides no remedy against them.  Manick and Kamadolli's Motion to Dismiss Count V is **GRANTED**.[133] For the same reason their Motion to Dismiss Count VI is **GRANTED.**  Just as the other Defendants accept the validity of the Engagement Letter, so do Manick and Kamadolli.[134]  Their Motion to Dismiss Count VII is **GRANTED**. Because the Court grants Manick and Kamadolli's motion, it need not address their jurisdiction and service arguments.

**THEREFORE,** Defendant Western Alliance Bank's Motion to Dismiss is **DENIED** as to Counts III, IV, and V, and **GRANTED** as to Count VI.  Count VI is **DISMISSED** as to Western Alliance Bank.  Defendants Theodore Sorom and Stephen Connor's Motion to Dismiss is **DENIED** as to

---

[130] Defs. Sorom and Connor's MTD at 9-10, D.I. 39.

[131] *Supra,* at ¶ 27 (citing Am. Compl., at ¶ 99, D.I. 34).

[132] Defs. Manick and Kamadolli's MTD, at 26-27, D.I. 50.

[133] The Court recognizes that granting Manick and Kamadolli's Motion to Dismiss Count V results in an inconsistency its denial of Sorom and Connor's motion.  The Court trusts that inconsistency will be resolved as the case progresses.

[134] Defs. Manick and Kamadolli's MTD, at 28-32, D.I. 50.

Count V, and **GRANTED** as to Counts VI and VII. Counts VI and VII are **DISMISSED WITH PREJUDUICE** as to Defendants Sorom and Connor. Defendants Alexandra Manick and Shyman Kamadolli's Motion to Dismiss is **GRANTED**. Counts V, VI, and VII as to Defendants Manick and Kamadolli are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

/s/ Ferris W. Wharton
Ferris W. Wharton, J.

28